# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CECIL PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-99-S-3444-NE |
| | ) | |
| VF JEANSWEAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This action is before the court on plaintiff's objections to select portions of a Report and Recommendation filed by Magistrate Judge Robert R. Armstrong, Jr., recommending that the court grant defendant's motion for summary judgment and dismiss all of plaintiff's claims with prejudice.[1] Plaintiff contends that defendant, his former employer, unlawfully discharged him on the basis of his race, retaliated against him for engaging in statutorily protected expression, and subjected him to a racially hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[2] This court must "make a *de novo* determination of those portions of the [Report and Recommendation] . . .

---

[1] Doc. no. 15 (Defendant's Motion for Summary Judgment); doc. no. 31 (Report and Recommendation); doc. no. 32 (Plaintiff's Objections).

[2] Doc. no. 1.

to which objection is made."  28 U.S.C. § 636(b)(1).[3]

---

[3] 28 U.S.C. § 636(b)(1) states:

(b)(1) Notwithstanding any provision of law to the contrary —

    (A) a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for *summary judgment*, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.

    (B) a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court *proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)*, of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

    (C) the magistrate judge shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1).  *See also* Federal Rule of Civil Procedure 72(b) (upon a party's objection to a Magistrate's Judge's recommended disposition of a matter, "the district judge to whom the case is assigned shall make a *de novo* determination . . . of any portion of the magistrate judge's disposition to which *specific written objection has been made* in accordance with this rule.") (emphasis supplied).

## I.  FACTUAL BACKGROUND

Defendant, VF Jeanswear, Inc., is a manufacturer and distributor of clothing apparel.[4]  Defendant's home office is in Greensboro, North Carolina, but it has manufacturing and distribution centers nationwide, including a distribution center located in Holly Pond, Alabama.[5]  As of November 2000, defendant employed approximately 220 employees at the Holly Pond facility.[6]

During the time period relevant to this lawsuit, Ellis Williams held the highest managerial position at the Holly Pond facility:  Distribution Center Manager (or "plant manager").[7]  Below Williams in the supervisory hierarchy were Lenny Girard, who served as the plant Superintendent during night shifts, and Scott Walls, who served as plant Superintendent during day shifts.[8]  Below them were six lower-level supervisors, each of whom managed specific departments within the plant.  Of these, Thomas Kinney supervised the warehouse department.[9]  Defendant also maintained a Human Resources department in the Holly Pond facility, and Brenda McHan was

---

[4] Deposition of Ellis Williams at 16-18.

[5] *Id.* at 13-16.  *See also* Williams deposition at cover page (identifying location of distribution center as Highway 278 East, Holly Pond, Alabama).

[6] *Id.* at 9.

[7] *Id.*

[8] *Id.* at 40.  Williams testified that Girard reports to Walls.  Even so, the record establishes that on multiple occasions, Girard reported directly to Williams.

[9] Williams Deposition at 39-41, 85.

the Senior Human Resources Representative.[10]

Defendant required its employees to adhere to two work rules which figure prominently in this suit. Defendant maintained a "no tolerance" policy against violence in the work place, which stated that "respect for other individual's well being both physical and mental[] requires that we[11] abstain from . . . fighting or other violent acts . . . anywhere on company property."[12] The "no tolerance" component of the policy meant that an employee would be terminated upon his or her first violation.[13]

Defendant also maintained a racial harassment policy. Defendant posted the policy in several places around the Holly Pond plant and distributed a copy of the policy to each employee.[14] The policy stated that racial harassment would "not be tolerated."[15] It instructed "any employee who believes that he or she is being harassed on the basis of race . . . to promptly report such matters" by lodging a complaint with his or her "supervisor, plant or distribution manager, department head, or a member

---

[10] Deposition of Brenda McHan at 7.

[11] The parties did not submit evidence which defined the term "we" as used in defendant's policy.

[12] Williams Deposition at Ex. 2 (Disciplinary Action Record).

[13] *Id.* at 58.

[14] *Id.* at 31, 33-37.

[15] Doc. no. **15A** (Memorandum of Law in Support of Defendant's Motion for Summary Judgment) at Ex. 14. The clerk of the court did not assign a document number to defendant's brief and evidentiary submission. The court informally assigns the number "15A," and has marked the document with this designation.

of the Human Resources staff, whichever person he or she feels most comfortable discussing the matter with."[16]  Defendant's standard policy was to conduct a "full investigation" upon receipt of an employee's report of racial harassment.[17]

## A.    Plaintiff's First Period of Employment

Plaintiff, Cecil Parker, is an American citizen of African descent.  He commenced his employment with defendant at the Holly Pond facility during April of 1995.[18]  During the periods relevant to the claims in this action, plaintiff worked as a "Stocker," which meant that he shelved inventory in the warehouse.[19]  One observer described plaintiff as being "rude to his coworkers," but "when he was on his job

---

[16]  *Id.*

[17]  Williams testified at his deposition:

    Q.    If a black person feels that they have been racially harassed —
    A.    Yes.
    Q.    — can you tell me what your policy says they are supposed to do?
    A.    We'd have a full investigation.
    Q.    So, they're supposed to report it?
    A.    Yes, sir.  They need to report it and then we'd have a full investigation.

Williams Deposition at 31-32.  Williams did not elaborate on what constituted a "full investigation."

[18]  Plaintiff stated that "I was hired [by defendant] on a temporary basis in April 1995, as a Puller.  I was reclassified as a permanent employee in October 1995 and assigned to a Stocker position."  Doc. no. 15A (Memorandum of Law) at Ex. 8 (EEOC Charge of Discrimination).
    Woody Burke, Manager of Human Resources for defendant's Southeast Division, had a different recollection of plaintiff's hiring date.  According to Burke, "in July 1995, [defendant] hired [plaintiff] . . . to work as a stocker in its distribution center in Holly Pond, Alabama."  Doc. no. 15 (Defendant's Motion for Summary Judgment), Burke Affidavit, ¶ 2 at 1.

[19]  Doc. no. 15 (Defendant's Motion for Summary Judgment), Burke Affidavit, ¶ 2 at 1; Deposition of Carol Watts at 20.

stocking, he worked hard at it."[20]

In April of 1996, approximately one year into his employment, a co-worker named Jeff Jackson told other employees that plaintiff was "costing them to have errors because [he] was putting [inventory] in the wrong places."[21]  When plaintiff objected, a co-worker named Nancy Bullard said "I should take that old Nigger[22] out to the oak tree out front."[23]  Plaintiff reported Bullard's comment to Lenny Girard, the night-shift plant Superintendent,[24] but "management never took any action to remedy the situation."[25]

Approximately seventeen months later, in September of 1997, plaintiff went to the office of plant-manager Ellis Williams to inquire about a gas tank he had purchased from Williams.  Plaintiff explained:

> I had talked to him two or three different times about the gas tank.  And always — he always put me on the back burner trying to give me the run around.  So one day I went out there to his office and I told the lady [Williams' secretary], I want to see Mr. Williams.  And the lady went back there to get Mr. Williams out of his office and I overheard Mr. Williams say get rid of that crazy n[----]r,[26] that's what he said.

---

[20] Watts Deposition at 18.

[21] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit **H**.  Exhibit 38 includes 15 separate affidavits.  The court has informally marked each affidavit, A through O.

[22] The court will hereinafter refer to this offensive, racist slur as **"n[----]r."**

[23] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit H.

[24] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 2 at 2.

[25] *Id.*, Ex. 1, ¶ 1 at 1.

[26] *See supra* note 22.

(Deposition of Cecil Parker, Vol. I at 221-222.)  After this incident, plaintiff was reluctant to speak to Williams about racial harassment at the workplace, because Williams "had used the 'N' word toward me so I didn't feel comfortable talking to him no more."[27]  Plaintiff could not recall whether he reported this incident to any other supervisor or Human Resources representative.[28]  Williams denied at his deposition that he had ever used a racial slur.[29]

In November of 1997, two months after the incident involving Williams, co-workers Gail Hollis, Vicki Moody, and Sherry Chasley directed racial slurs at plaintiff, including the term "n[----]r."[30]  Plaintiff reported the incident to an unidentified supervisor, but when "nothing was said or done" in response, plaintiff "sent a letter to Human Resources [telling them] that I didn't want them to no longer cut union dues out of my check if they were not going to stop the harassment and the racial slurs."[31]  Again, "management never took any action to remedy the situation."[32]

Plaintiff also was confronted with threats of physical violence.  He claimed that on February 26, 1998,

> Troy the security guard and some of the white employee's [sic] came out

---

[27] *See* Parker Deposition, Vol. I at 201-204.

[28] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 2 at 4.

[29] Williams Deposition at 55.

[30] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit M.

[31] *Id.*

[32] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 1, ¶ 1 at 1.

> and went to talking about how they were going to beat me up and that it
> was unfair that I got the up time work and had seniority over them, they
> wanted to go to Shaw's restaurant to have a show down, and they were
> using threatening language toward me . . . .

(Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit J.)  Defendant did

not terminate the individual identified in this record only as "Troy the security guard,"

even though plaintiff reported this incident to Lenny Girard, the night-shift

Superintendent.  *Id.*[33]

The following day, co-worker Jimmy Denton said it was "time for [whites] to

put the n[----]rs back in their place."[34]  Plaintiff "called Human Resources and told

Brenda McHan [the Senior Human Resources Representative] . . . that Jimmy Denton

had referred to black people as n[----]rs and they should be put back in their place.  All

she said was oh how awful, and nothing was said or done about that."[35]  McHan

testified at her deposition that she did not remember such a report.[36]

On or about May 13, 1998, plaintiff had another confrontation with Troy the

security guard.  Plaintiff recalled:

> [A co-worker] came and told me that Troy said the white men did the n[-
> ---]rs a favor by bringing them over here, all n[----]rs should be put on
> a boat and sent back to Africa.  I got angry about it and I went to Troy
> and asked him why he was doing that and I asked him did he say it and

---

[33] Neither party deposed Girard during the course of discovery.

[34] Doc. no. 15A (Memorandum of Law) at Ex. 38, Parker affidavit J.

[35] *Id.*

[36] McHan Deposition at 17.

he said yes he said it then I went and told Lenny [Girard] the plant superintendent, [Girard] told me to have him apologize but I told him an apology wouldn't be accepted this time something had to be done this time.  So I went to the guard station with [Girard] and asked Troy to tell [Girard] what he told me and Troy told [Girard] what he had said and [Girard] said Troy is just telling the truth about it.  Troy said tell me that the doesn't [sic] have any thing against me and he wasn't talking about me, and I told him that he was talking about all black people, and [Girard] said if Troy would apologize to me would I accept it and I said no and walked away.

(Doc. no 15A (Memorandum of Law), Ex. 38 at Parker affidavit L.)

Girard reported this incident to Williams, the plant manager.  Williams testified at his deposition:

I don't recall the exact date, but when I came in one morning I had a voice mail from Lenny Gerrard [sic] telling me that I had a security guard that had made a racial statement down there using the, I think, N word.  I immediately picked up the phone and called Ron Jones, who is over security, and told him that I didn't want this gentleman back in the building, I wanted him terminated.  We wouldn't tolerate that.

(Williams Deposition at 65.) Williams confirmed that the security guard, whose name he could not remember, was in fact terminated pursuant to his instructions.[37]  Williams contended, however, that Troy "didn't work for me . . . He was contracted."[38]  Plaintiff does not dispute that Troy was a contract, as opposed to a permanent, employee of defendant.[39]

---

[37] Williams Deposition at 65.

[38] *Id.* at 79.

[39] Parker Deposition, Vol. I at 241-242.  Troy appears to have been employed by an entity identified as "Jones Security Services."  *See* doc. no. 15A (Memorandum of Law), Ex. 38 at Parker

That same month (May of 1998), co-worker Jackie Woods came to work "one night with a confederate flag shirt on hollering white power and using . . . the 'N' word towards [plaintiff]."[40]  Woods was joined by co-workers Paula Duncan, Connie McLendon, and Leah Woodward, and the four women shouted "white power, white power, white power . . . [with] confederate T-shirts on, hollering n[----]r in the plant."[41]  Plaintiff recalled that Lenny Girard, the night-shift Superintendent, was at the scene and personally observed the commotion.  Girard was "watching back there then watching them.  He heard — I told him, I made sure he heard it because I told him about it . . . [Girard] observed it, he was sitting there looking at it."[42]  Even so, "management never took any action to remedy the situation."[43]

Later during that same month (May of 1998), a white employee and an African American employee engaged in a physical altercation at the plant.[44]  Plaintiff went to the scene of the fight, and Tom Kinney, plaintiff's direct supervisor,[45] also was

---

affidavit L (stating that "[s]o I called Jones Security Services and told them Troy was creating a hostile working environment and he needed to be moved").  However, the record is devoid of any evidence concerning the precise nature of the contractual relationship between Troy, Jones Security Services, and defendant.

[40] Parker Deposition, Vol. I at 239.

[41] *Id.*, Vol. II at 79-80; doc. no. 15A (Memorandum of Law), Ex. 39 at second appended affidavit of Shirley Calvert.

[42] Parker Deposition, Vol. II at 80.

[43] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 1, ¶ 1 at 1.

[44] Parker Deposition, Vol. I at 243.

[45] *See* doc. no. 15A (Memorandum of Law) at 4 (defendant identifies Kinney as "Plaintiff's supervisor); *see also id.* at Ex. 6 (Kinney signs plaintiff's Disciplinary Action Record as

present.  As the ambulance arrived, plaintiff overheard Kinney say, "that's what we get when we don't use a big oak tree no more."[46]  Plaintiff inferred that the "big oak tree" referred to "hanging black folks."[47]  Plaintiff could not remember whether he reported his supervisor's remark to anyone above him in the corporate chain-of-command.[48]

A month later, on or about June 24, 1998, plaintiff overheard racial comments made by a co-worker identified only as "Elrod."  Plaintiff recalled that, during his lunch break that day,

> I was sitting in my truck and a [sic] employee named Elrod was standing with 4 or 5 other employee's [sic] and he started talking about n[----]rs need to be put back in their place, they think they can just take over and they need to go back to Africa.  He saw a bunch of n[----]rs on motorcycles going to Huntsville and they were trying to take over the whole road.  I got out of my truck and started into the plant and he said there goes one now.

(Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit D.)  Plaintiff reported this incident to night-shift supervisor Lenny Girard, but "all [he] told Elrod to do was apologize to [plaintiff]." At this point, "the other employees got involved and started saying [Elrod] shouldn't be penalized for that [because] he just made a

---

"Supervisor").

[46] Parker Deposition, Vol. I at 243.

[47] *Id.*

[48] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 2 at 4.

mistake."[49]   Plaintiff refused to accept Elrod's apology.[50]

The racially charged incidents continued during August of 1998.   Plaintiff claims that he overheard the following individuals use the racist slur "n[----]r" during this period:  (1) a co-worker named Jeff Jackson; (2) Tom Kinney, plaintiff's direct supervisor, who had earlier alluded to the "big oak tree"; and (3) Jackie Woods, the co-worker who earlier had worn a confederate-flag T-shift to work and yelled "n[----]r" and "white power."[51]   Plaintiff claims that he reported all three incidents to plant manager Ellis Williams,[52] but Williams denies that.[53]   While plaintiff is unable to identify the precise dates on which he lodged these complaints, he did so "shortly *before* [August 19, 1998, the date of plaintiff's] . . . termination."[54]

Finally, plaintiff claims that the following racially charged incidents occurred sometime between 1995 and 1998.  Plaintiff heard co-workers Randy Olinger, Warren Maze, and Paul Day use racial slurs such as "n[----]r."[55]   Plaintiff also heard Carol Watts, a lower-level supervisor at the Holland Pond facility,[56] state that she was glad

---

[49] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit D.

[50] Parker Deposition, Vol. II at 81.

[51] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 2 at 2

[52] *Id.*

[53] Williams Deposition at 51-53.

[54] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 1, ¶ 1 at 2.

[55] *Id.*, Ex. 2 at 4.

[56] *See* Williams Deposition at 40.

that she didn't have any "n[----]rs" working in her department.[57]  Plaintiff added that "many of the people constantly used racial slurs and comments which I cannot remember at this time or I cannot remember the dates.  Let me state that the racial harassment was continuous during the entire time I was employed."[58]

## B.    Plaintiff's First Termination

Plaintiff was working in the warehouse on August 14, 1998, in close proximity to co-workers Jeff Jackson and Connie Woods.[59]  Plaintiff was perspiring heavily from his labor.  Seeing this, Jackson and Woods laughed, held their noses, and commented that plaintiff had bad body odor.[60]  Plaintiff reported this incident to night-shift supervisor Lenny Girard, who proceeded to call Woods, Jackson, and plaintiff into his office.[61]  Girard also called into the meeting Tom Kinney, plaintiff's direct supervisor in the warehouse department.[62]

When plaintiff entered Girard's office, he found Woods crying and claiming that she had not ridiculed plaintiff.  The table turned when Jackson claimed that

---

[57] Doc. no. 22 (Plaintiff's Evidentiary Submission), Ex. 2 at 4.

[58] *Id.*

[59] *See* doc. no. 15A (Memorandum of Law), Ex. 36 (identifying "Time of Incident"); *see also id.*, Ex. 38 at Parker affidavit G.

[60] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit G; Parker Deposition, Vol. II at 71-72.

[61] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit G.

[62] *Id.*; Parker Deposition, Vol. II at 71; *see also* Williams Deposition at 85 (identifying Kinney as "warehouse supervisor" at the time of this incident); doc. no. 15A (Memorandum of Law) at 4 (identifying Tom Kinney as "Plaintiff's supervisor").

plaintiff had threatened him with physical violence.[63]  Plaintiff testified as follows during his deposition:

> Q.    And in that meeting did [Jackson] claim to management, in your presence, that you had threatened to break his neck?
>
> A.    Well, he said — I don't know about his neck or about his — something about kicking his butt or something like that.  I don't know which one it is he said, I don't recall what he said.

(Parker Deposition, Vol. II at 72.)  After this meeting, plaintiff returned to work and completed his shift.[64]  Plaintiff continued his employment for an additional five days.

Sometime between April 14 and April 19, Lenny Girard reported to plant manager Ellis Williams that plaintiff had threatened Jeff Jackson with physical harm.[65] Tom Kinney apparently made a similar report.[66]  Williams cited this incident as the basis for plaintiff's termination at his deposition:

> Q.    Why was [plaintiff] terminated . . . ?
>
> A.    Because I thought that he had, according to witnesses,[67] had

---

[63] Doc. no. 15A (Memorandum of Law), Ex. 38 at Parker affidavit G.

[64] Doc. no. 15A (Memorandum of Law), Appendix A (arbitration decision) at 7.

[65] *See* Williams Deposition at 85-86.

[66] Williams testified at his deposition:

> Q.    How did you learn of the threat that [plaintiff] made to another employee?
> A.    It was reported to me by Lenny [Girard] and Tom Kenny [sic].
> Q.    And so Lenny Gerrard [sic] reported it to you and Tom Kenny as well?
> A.    Well, Lenny [Girard] reported it.

Williams Deposition at 85.

[67] By "witnesses," Williams appears to be referring to Girard and Kinney, with whom he

14

made threats to two individuals[68] and we had a no tolerance
policy about making threats to people.

(Williams Deposition at 56.)

After plaintiff completed his shift on August 19, Kinney directed plaintiff to

report to Girard's office, where Girard informed plaintiff of his termination.[69]

Plaintiff was issued a Disciplinary Action Record ("Record"), which officially notified

him of his discharge.  The Record stated that he was being discharged for "threatening

physical harm to another associate" in violation of defendant's policy against violence

in the work place.[70]  The Record indicated that it was plaintiff's first offense of this

nature.  Kinney signed the Record as plaintiff's supervisor, and Williams initialed the

form to indicate that he had reviewed and approved the termination decision.[71]

## C.    Plaintiff's Second Period of Employment and Termination

Following his August 19, 1998 termination, plaintiff filed a grievance through

his union, and the case was brought before an arbitrator.[72]  The arbitrator sustained the

---

conferred.  *See id.*  No party suggests, nor does the record indicate, that Williams spoke directly with
plaintiff, Jackson, or Woods about the incident in question.

[68] It is clear, from the context of Williams' deposition testimony, that one of these "two
individuals" is Jeff Jackson.  *See* Williams Deposition at 87-88 ("Q.  Is it your understanding that
[plaintiff] made a threat to Jeff Jackson . . .?  A.  Yes.").

[69] Doc. no. 15A (Memorandum of Law), Appendix A (arbitration decision) at 7.

[70] *Id.* at Ex. 36.

[71] *Id.*

[72] *Id.*, Appendix A (arbitration decision).

grievance and reinstated plaintiff to his position with back pay.[73]  Plaintiff began his second period of employment in May of 1999, but defendant terminated him shortly thereafter, on August 3, 1999.  Defendant claimed that plaintiff became "loud and belligerent" when his supervisors called him into a meeting to discuss allegations by plaintiff's co-workers that he had subjected them to sexual harassment.[74]

### D.    Plaintiff's Suit

Plaintiff filed suit against defendant on December 29, 1999.[75]  Plaintiff's claims encompassed both his 1998 *and* 1999 terminations.  He claimed that:  (1) defendant discharged him on the basis of his race in 1998 and in 1999; (2) defendant retaliated against him in 1998 and 1999 for engaging in statutorily protected expression; and (3) defendant subjected him to a racially hostile work environment during the period of his first employment.  Plaintiff claimed that all of these actions were in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[76]

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to one of the magistrate judges serving this court for preliminary review and recommendation.  Defendant moved for summary judgment

---

[73] *See id.* at 12.

[74] Doc. no. 15A (Memorandum of Law), Ex. 2 and 5.

[75] Doc. no. 1.

[76] *Id.*

on December 15, 2000.[77]   The Magistrate Judge did not issue a Report and Recommendation on the disposition of that motion until June 25, 2004, some three and one-half years later.  He recommended that the court grant defendant's motion for summary judgment on all claims.[78]  Plaintiff objected  to those portions of the Report and Recommendation which addressed the claims related to his *first* termination.  The case was initially reassigned to Senior United States District Judge Robert B. Propst,[79] but reassigned to this judge on August 18, 2004.[80]

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but also that it "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c) (emphasis supplied).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

---

[77] Doc. no. 15.

[78] Doc. no. 31.

[79] Doc. no. 39.

[80] Doc. no. 40.

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

## III. DISCUSSION

### A. Abandoned Claims

While plaintiff's complaint encompassed both his 1998 and 1999 terminations, he has conceded those claims related to his second termination. In his brief opposing defendant's motion for summary judgment, plaintiff stated: "[w]ith this summary

judgment response, [plaintiff] limits this action to a claim for racially hostile work environment and claims of race discrimination and retaliation with regard to his termination in August of 1998."[81]   Accordingly, defendant's motion for summary judgment on plaintiff's claims of discriminatory discharge and unlawful retaliation related to his second termination is due to be granted.   The remainder of this memorandum opinion will address only those claims related to plaintiff's *first* period of employment.

## B.    Discriminatory Discharge

Title VII provides, in relevant part, that it is unlawful for an employer "to discharge any individual . . . because of such individual's race . . . ."  42 U.S.C. § 2000e–2(a)(1).  Similarly, § 1981 prohibits discrimination on the basis of race in the termination of contracts.  *See also, e.g., Jones v. R.R. Donnelley & Sons Company*, ___ U.S. ___ , 124 S. Ct. 1836, 1845-1846 (2004) (recognizing a claim of wrongful termination under 42 U.S.C. § 1981).

Section 1981 generally is described as "a parallel remedy against [racial] discrimination which . . . derive[s] its legal principles from Title VII,"[82] and both

---

[81] Doc. no. 22 (Plaintiff's Brief) at 1.

[82] *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

statutes "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical.") (citations omitted).

Title VII and § 1981 claims require proof that an employer intentionally discriminated against an employee on the basis of his race. *See*, *e.g.*, *Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir. 1991). Where, as here, plaintiff has presented only circumstantial evidence on this issue, courts are guided by the now-familiar analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106

F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254.).

To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted

justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

Here, the Magistrate Judge concluded that plaintiff had failed to establish a *prima facie* case of discriminatory discharge and, alternatively, that plaintiff had failed to prove that defendant's stated, non-discriminatory reason for terminating his employment was a pretext for discrimination.[83]

## 1.    Plaintiff's prima facie case

In the Eleventh Circuit, "a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and 'that the misconduct for which he was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (quoting *Davin v. Delta Airlines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)[84]). "When an

---

[83] Doc. no. 31 (Report and Recommendation) at 16.

[84] In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981.

individual proves that he was fired but one outside his class was retained although both violated the same work rule, this [gives rise to a presumption] that the rule was discriminatorily applied against that individual, regardless of the race or sex of the replacement." *Nix*, 738 F.2d at 1186; *see also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282-84 (1976) (holding that an employer would violate Title VII if it fired black employees who participated in a theft of cargo while retaining white employees guilty of the same offense).

Here, the court requested the parties to submit additional briefs addressing the following question:  may plaintiff establish his *prima facie* case of discriminatory discharge by demonstrating that defendant terminated plaintiff, but retained "Troy the security guard," even though both violated the same work rule?

Troy is Caucasian, and he therefore falls outside of plaintiff's protected class.[85] Even so, defendant argues that Troy is not a proper comparator because:  (1) there is no evidence that plant manager Ellis Williams was aware of Troy's threats to plaintiff; (2) Troy was a contract employee; and (3) Troy's threats were not similar in nature or quality to plaintiff's threats.  The court will address each of these arguments in turn.

---

[85] The record establishes that Troy is Caucasian.  Following his first discharge, plaintiff filed a complaint with the EEOC, in which he stated the following:  "I had been protesting against the use of racial slurs made by the Security Guard, Mr. Troy.  Mr. [T]roy stated that 'Niggers think that White people owe them something, *we* did them a favor by bring [sic] them over here.' *Other White* employees have made racial slurs and these have been reported . . . ."  Doc. no. 15A (Memorandum of Law), Ex. 30 (emphasis supplied).

### a.    Ellis Williams was not aware of Troy's threats to plaintiff

In order to compare the discrimination experienced by a plaintiff to that of other employees outside his protected class, the plaintiff must show that he and the co-workers with whom he compares himself were "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)); *see also Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998) (same).  This "similarly-situated" requirement means, among other things, that the relevant decisionmakers must be aware of the comparator's similar misconduct.  *See, e.g., Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 ("[U]nless the [relevant decisionmakers] knew of the events, the events cannot be considered in determining whether [two employees] are similarly situated."); *Silvera v. Orange County School Board*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").

Defendant argues that plaintiff and Troy the security guard cannot be similarly situated because there is no evidence that plant manager Williams was ever made aware of Troy's threats.

> In this case, it is undisputed that Ellis Williams was the decisionmaker with respect to Plaintiff's 1998 termination.  However, there is no evidence that Williams ever knew of the purported threats by . . . "Troy the security guard."  Plaintiff concedes that he only reported the alleged

24

threats to Lenny Girard, and there is simply no evidence that Girard or anyone else subsequently notified Williams. Therefore, these purported threats cannot serve as comparator evidence for purposes of Plaintiff's prima facie case.

(Doc. no. 46 (Defendant's Supplemental Brief) at 3.)   The court disagrees with defendant's analysis.

First, Williams was not the sole decisionmaker with respect to plaintiff's first termination. Lenny Girard called the meeting with plaintiff, Connie Woods, and Jeff Jackson to determine whether the latter two had ridiculed plaintiff, during which Jackson stated that plaintiff had threatened him with physical violence. Girard then reported his findings and conclusions to Williams. There is no evidence that Williams spoke to plaintiff, Jackson, or Woods about what had transpired; instead, Williams' decision to terminate plaintiff was based upon the information related by Girard.

Girard also was aware of plaintiff's claim that "Troy the security guard" had threatened him with physical violence. Admittedly, there is no evidence that Girard reported this incident to Williams. Nevertheless, Girard was plant superintendent during night shifts, and he was aware of both instances of threatening behavior, but recommended only the termination of plaintiff.   "Disparate treatment analysis 'requires that none of the participants in the decision making process be influenced by racial bias.'  'Thus the motivations of both  the [upper management] and of the [middle management] are pertinent.'" *Anderson v. WBMG-42*, 253 F.3d 561, 566

(11th Cir. 2001) (brackets in original) (quoting *Jones v. Gerwens*, 874 F.2d 1534, 1542 n.13 (11th Cir. 1989)).  Accordingly, defendant's argument that Williams did not know of Troy's threat is unavailing.

### b.   Troy's status as a contract employee

Defendant also argues that plaintiff and Troy were not similarly situated, because Troy was a contract employee, whereas plaintiff was a permanent employee.[86] According to defendant, "several courts have recognized that contract employees and independent contractors cannot serve as a relevant comparator for purposes of the similarly-situated requirement because they are typically subject to different rules, policies, and performance expectations."[87]  It is not clear from this statement whether defendant is advocating a *per se* rule that a contract employee may never serve as a proper comparator, or is arguing that a contract employee may not serve as a proper comparator *if* he is subject to different work rules.  This court will therefore address both arguments.

The court declines to adopt a *per se* rule that a contract employee may *never*

---

[86] Doc. no. 46 (Defendant's Supplemental Brief) at 3.

[87] *Id.* (citing *Taylor v. ADS, Inc.*, 327 F.3d 579 (7th Cir. 2003), and *Marano v. Aircraft Braking Systems, Inc.*, 138 F. Supp. 2d 940 (N.D. Ohio 2001)).  In *Marano*, the court distinguished between a contract employee and a permanent employee, because one "was not subject to the same system of performance evaluations" as the other.  138 F. Supp. 2d at 951.  In *Taylor*, the Seventh Circuit stated, without elaboration, that plaintiffs could not make out their *prima facie* case of discriminatory discharge because "the only potential comparative plaintiffs point to, a white male by the name of John Noel, is not an employee; he is an independent contractor."  327 F.3d at 581.

serve as a proper comparator.  Defendant does not cite, and the court could not find, any Eleventh Circuit case enunciating such a rule.  Furthermore, the pivotal question is whether a comparator is "similarly situated in all *relevant* respects."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  That inquiry appears to require, at a minimum, a discussion of why two individuals are not similarly situated.  Accordingly, one critical factor, which defendant alludes to, is whether plaintiff and Troy were both subject to the rule prohibiting violence in the work place.  Plaintiff is unable to offer direct evidence on this issue.  Rather, plaintiff states that Troy was "subjected to the same rules as the plaintiff since, according to the defendant, he was terminated for using the 'n' word at work," in violation of defendant's policy against racial harassment.[88]

When considering a motion for summary judgment, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and, to resolve all reasonable doubts in that party's favor.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).  Inferences in favor of the non-moving party are not unqualified, however.  In *Daniels v. Twin Oaks Nursing*

---

[88] Doc. no. 47 (Plaintiff's Response) at 2-3 (footnote omitted).

27

*Home*, 692 F.2d 1321 (11th Cir. 1982), the Eleventh Circuit stated that:

> The standard for determining whether an inference is allowable is
> generally whether it is a reasonable one, that is, whether it is one that
> "reasonable and fair-minded men in the exercise of impartial judgment"
> might draw from the evidence. *Boeing Company v. Shipman*, [411 F.2d
> 365,] 375 [(5th Cir. 1969) (*en banc*)].  An inference is not unreasonable
> simply because it is based in part on conjecture, for an inference by
> definition is at least partially conjectural.  *Helene Curtis Industries, Inc.
> v. Pruitt*, 385 F.2d 841, 851 (5th Cir.1967), *cert. denied*, 391 U.S. 913,
> 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968).  Yet a jury will not be allowed to
> engage in a degree of speculation and conjecture that renders its finding
> a guess or mere possibility. *Id.*  Such an inference is infirm because it is
> not based on the evidence.  Unavoidably, "[i]n deciding how much the
> jury can speculate ... [t]he line of demarcation which we are required to
> walk is ephemeral."  *Id.*

*Id.* at 1326.  The book ends of this "reasonableness test" may be restated as follows:

while an inference may be reasonable even though based partly on conjecture, an

inference is unreasonable "if it is at war with uncontradicted or unimpeached facts."

*Helene Curtis Industries*, 385 F.2d at 851.

Here, the record does not contradict the inference that "Troy the security guard"

was subject to defendant's anti-violence policy.  Instead, there is uncontradicted

evidence that Troy was subject to defendant's policy against *racial harassment*, and

from this point, it requires only a small inferential step to find that Troy also was

subject to defendant's "no tolerance," anti-violence policy.  Of course, the type of

work rule at issue is significant.  It would not be reasonable, for example, to conclude

that Troy was subject to a rule peculiar to plaintiff's duties as a Stocker.  That is not

the contention here, however.

Another question, which defendant does not address, is whether plaintiff and Troy were subject to the same, relevant, decisionmaking process by management. Troy's immediate supervisor was Ron Jones, who managed the security guards working at defendant's Holly Pond facility. There is no evidence that Girard — a linchpin in the decision to terminate plaintiff — had explicit authority to supervise Troy. Even so, the record demonstrates that Girard, *in practice*, possessed such authority, because Williams ordered the termination of Troy as a Security Guard after Girard informed him that Troy was using racial slurs. Williams testified:

> [W]hen I came in one morning I had a voice mail from Lenny Gerrard [sic] telling me that I had a security guard that had made a racial statement down there using the, I think, N word. I immediately picked up the phone and called Ron Jones, who is over security, and told him that I didn't want this gentleman back in the building, I wanted him terminated. We wouldn't tolerate that.

(Williams Deposition at 65.) Two inferences that may be drawn from this passage are: Williams decided to terminate Troy the security guard based solely on the information provided to him by Girard; and, even though Troy is described by defendant as a "contract employee," Williams's directive to fire him was complied with. The decisionmaking process therefore flowed from Girard to Williams, in the same way as the process implemented to terminate plaintiff. Given these facts, the distinction between the employment status of plaintiff and Troy does not preclude

plaintiff from satisfying his *prima facie* case.

### c.    Similarity of misconduct

Third, and finally, defendant argues that the threats attributed to plaintiff and Troy were not sufficiently similar in nature or quality.  Specifically, defendant contends that Troy's threat to "beat up" plaintiff was "illusory and generalized in nature," whereas plaintiff's threat to break his co-worker's neck was a "specific and detailed threat of violence."[89]

The following is a concise summary of the Eleventh Circuit's guidance on what is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."  *Id.* (internal quotations and citations omitted).  *We require that the* quantity and *quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.  See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).  Thus, plaintiff must

---

[89] Doc. no. 46 (Defendant's Supplemental Brief) at 4.

show that employees outside his protected class were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways.  *Id.*; *see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.").

Here, the quality of the threats made by plaintiff and Troy were "fair congeners."  Both made their threats in person while on work premises.  A threat that "I'm going to break your neck" is sufficiently similar to a threat that "I'm going to beat you up"; each is a figure of speech communicating a desire to inflict physical harm on another person.  Defendant's attempt to distinguish the threat made by plaintiff and Troy is unavailing.[90]

---

[90] Defendant argues that *Keel v. United States Department of Air Force*, 256 F. Supp. 2d 1269 (M.D. Ala. 2003), directly supports its claim that the threats made by Troy and plaintiff were sufficiently dissimilar.  This court disagrees.

In *Keel*, the plaintiff was discharged for off-duty misconduct.  Plaintiff allegedly mailed an anonymous letter to a co-worker's home, with the following message typed in bold, large uppercase text: "FUCK YOU BETTY NIGGER BITCH NOW GO THE CHIEF WE ARE GOING TO GET YOU." *Id.* at 1274.  Plaintiff also allegedly mailed a second anonymous letter to the same victim two weeks later.  That letter stated: "Betty, you dumb Nigger Bitch.  You should not have done what you did with your Big Fat Ass Mouth.  You need to go back where you belong in 120 days. We are watching you and will get you for this." *Id.*  The co-worker was so alarmed by these anonymous threats that she installed an alarm system and motion sensor at her home; started to keep a gun in her bed and car; began taking prescription tranquilizers and sleeping pills in an attempt to deal with her fear; and was placed in protective custody for her safety for three or four days. *Id.*

The *Keel* Court found that plaintiff's alleged misconduct was not nearly identical to the following conduct by plaintiff's fellow employees.  Plaintiff's employer was the United States Department of Air Force.  In one incident, a military dependent threatened to hit an employee with a stick if she did not quiet down.  The employee "replied that if the female military dependant hit her, someone should call security; implying that if [the employee] was indeed struck, she would respond in kind." *Id.* at 1280.  In another incident, an employee engaged in a "heated exchange"

In sum, plaintiff and Troy were similarly situated in the following relevant respects: they were subject to termination by the same supervisor (Williams) through a similar decisionmaking process (Girard reporting an employee's misconduct to Williams); they were, by reasonable inference, subject to the same policy prohibiting violence in the work place; their similar violations of that policy were reported to the same supervisor, Girard; and Girard recommended the termination of (and defendant in fact discharged) plaintiff, but not Troy, for violating the same policy.

Accordingly, the court finds that plaintiff has established his *prima facie* case of discriminatory discharge. The burden therefore shifts to defendants to articulate a legitimate, non-discriminatory reason for the challenged employment decision. *See, e.g., Hicks,* 509 U.S. at 506-07; *Walker v. Mortham,* 158 F.3d 1177, 1183 n.10 (11th Cir. 1998).

### 2.   Defendants' legitimate, nondiscriminatory reason for discharging plaintiff

According to defendant, "it terminated Plaintiff's employment in August 1998, because Plaintiff had threatened a fellow employee, Jeff Jackson."[91]  A violation of

---

with a co-worker, after which the employee stated to a supervisor, outside of the co-worker's presence, that the supervisor had better "take care of that son of a bitch before [she] kill[s] him." *Id.* at 1279.

This court agrees that an anonymous, vicious threat sent to a person's home is not "nearly identical" to an employee's implicit threat to strike back at a military co-worker, or a threat made outside of the presence of the person to whom the threat was intended.   *Keel* is clearly distinguishable from the facts of this case, however, for the reasons stated in the text of this opinion.

[91] Doc. no. 15A (Memorandum of Law) at 13-14.

a workplace rule prohibiting violence or threats of violence certainly is a legitimate reason for disciplining, or even terminating, an employee. *Cf., e.g., Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989) (plaintiff disciplined for violation of work rule prohibiting unauthorized use of a vehicle).   Defendant thus has articulated a legitimate, non-discriminatory reason for the adverse employment actions taken against plaintiff, and the presumption of discriminatory discharge established by plaintiff's *prima facie* case is rebutted.  Plaintiff now must be afforded the opportunity to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Combs,* 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).

### 3.    Pretext

Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'"  *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff argues that the following factors demonstrate that defendant's proffered reason was merely a pretext for discrimination: (1) defendant fired plaintiff for violating defendant's policy against violence in the workplace, but did not terminate "Troy the security guard" for violating the same policy (*i.e.*, the facts supporting plaintiff's *prima facie* case of discriminatory discharge);[92] (2) when plaintiff went to Williams' office to inquire about his purchase of a gas tank, Williams told his secretary to "get rid of that crazy n[----]r";[93] and (3) plaintiff's co-workers subjected him to racial harassment, but his supervisors failed to curtail that harassment.[94]

---

[92] Doc. no. 47 (Plaintiff's Response) at 4-5.

[93] Doc. no. 22 (Plaintiff's Brief) at 21-22.

[94] *See id.* ("The multitude of racially discriminatory comments by other employees and management's reaction to [plaintiff's] complaints are also indicative of the racially discriminatory atmosphere in the plant."); *see also id.* at 24 ("A jury could certainly infer discrimination . . . after it has heard [plaintiff's] continual complaints of racially discriminatory and threatening behavior which were never addressed.").

As a fourth factor, plaintiff states that a jury may disbelieve defendant's proffered reason for terminating plaintiff because an arbitrator determined that "there was not clear and convincing evidence that [plaintiff] ever threatened Jackson." *Id.* at 23. This argument is unpersuasive. A plaintiff may not recast an employer's proffered nondiscriminatory reason for an employment decision. *See, e.g.,Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY*

Plaintiff's first articulated factor strikes at the heart of defendant's proffered reason for discharging plaintiff.  According to defendant, Williams discharged plaintiff because he violated the policy against violence in the workplace.  But plaintiff's *prima facie* case anticipated, and eliminated, that potential reason for plaintiff's discharge.  *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1129-1130 (11th Cir. 1984) (observing that, under the *McDonnell Douglas* framework, "an employee must first present a prima facie case of discrimination, by eliminating the 'most common nondiscriminatory reasons for the plaintiff's rejection'") (quoting *Burdine*, 450 U.S. at 253-54).

Williams statement to his secretary, to "get rid of that crazy n[----]r," furthers plaintiff's circumstantial case for pretext.  Williams' comment is not direct evidence of discrimination.  It was not related to the decision to terminate plaintiff, and it was uttered approximately eleven months prior to the termination decision.  *See, e.g., Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (a comment too remote in time, or too attenuated because it was not directed at plaintiff, does not

---

*Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Furthermore, plaintiff argues that a jury may reject defendant's proffered reason for terminating plaintiff because defendant's management disbelieved plaintiff's complaints that his co-workers were making racial slurs, but believed the complaint of Jackson, who is white, that plaintiff had threatened him with physical violence.  Doc. no. 22 (Plaintiff's Brief) at 24.  This argument also is unpersuasive.  There is no evidence that defendant's management *disbelieved* plaintiff's complaints of racial harassment.  Management may have failed to respond to plaintiff's complaints, but that does not necessarily (or even probably) mean that management disbelieved what plaintiff had reported.

qualify as direct evidence of discrimination).   Nevertheless, Williams' comment certainly constitutes strong circumstantial-evidence of the ultimate decisionmaker's discriminatory attitude.   *See id*. at 1291-92 (a decisionmaker's discriminatory comment, which does not qualify as direct evidence of discrimination, may nevertheless provide circumstantial evidence to support an inference of discrimination); *see also Scott v. Suncoast Beverage Sales, LTD*., 295 F.3d 1223, 1229 (11th Cir. 2002) (same); *Rojas v. Florida*, 285 F.3d 1339, 1343-1344 (11th Cir. 2002) (same).

Girard's idle responses to plaintiff's reports of racial harassment also furthers plaintiff's case for pretext.  Girard passively observed as white employees shouted "white power" and "n[----]r" in the plant, without taking action to halt the demonstration, even after plaintiff complained directly to him of the conduct.  Girard may have never uttered a racist remark, but his inaction in this situation is telling. Tom Kinney, plaintiff's direct supervisor and a participant in the meeting leading to plaintiff's termination, also uttered racial slurs such as "n[----]r," and made racially disparaging references to the "big oak tree."  A reasonable jury could therefore conclude that *all* supervisors involved in the decision to terminate plaintiff — Williams, Girard, *and* Kinney — harbored a racial animus.  Furthermore, as quoted by the Eleventh Circuit in *Ross*, the racist remarks by plaintiff's co-workers may

"constitute evidence of the atmosphere in which the employment decision was carried out." *Ross*, 146 F.3d at 1291 (quoting *Walden v. Georgia-Pacific Corporation*, 126 F.3d 506, 521 (3rd Cir. 1997).

Plaintiff's *prima facie* case, together with the "fairly strong additional evidence" of discrimination, is sufficient to satisfy plaintiff's burden of establishing pretext. *See, e.g., Ross*, 146 F.3d at 1292 (evidence that a decisionmaker engaged in the same activity for which plaintiff was terminated, plus evidence of decisionmakers' racist remarks which were unrelated to the challenged employment decision, were sufficient to establish pretext). *Cf. Rojas*, 285 F.3d at 1342-43 (holding that a decisionmaker's single discriminatory comment, which was unrelated to the challenged employment decision, was insufficient to establish pretext, and distinguishing *Ross* as a case where there was "fairly strong additional evidence" supporting a finding of pretext); *Scott*, 295 F.3d at 1229-30 (same).

For the foregoing reasons, defendant's motion for summary judgment on plaintiff's claim of discriminatory discharge is due to be denied.

## C.   Retaliation

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in

activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . *because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter*, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis supplied).  The "opposition clause" provides protection to those employees "who informally voice complaints to their superiors or who use their employers' internal grievance procedures."  *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989); *see also, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (same).

Even though the text of 42 U.S.C. § 1981 does not contain an explicit prohibition against retaliation, the Eleventh Circuit has held that retaliation claims asserted in the context of a complaint of racial discrimination, and arising after the effective date of the Civil Rights Act of 1991, generally are cognizable under the statute.  *See, e.g., Webster v. Fulton County, Georgia*, 283 F.3d 1254, 1256 (11th Cir. 2002) (observing that "[w]e have previously concluded that Section 1981 supports a retaliation cause of action") (citing *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998)).

In the absence of direct evidence of an intent to retaliate against an employee

who engaged in protected expression, both Title VII and § 1981 require a plaintiff to comply with the *McDonnell Douglass* analytical framework in order to survive a motion for summary judgment. *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 1176, 1185 (N.D. Ala. 1999).

In this instance, the Magistrate Judge concluded that plaintiff failed to establish his *prima facie* case of retaliation, and appeared to recommend that defendant's motion for summary judgment be granted on that basis.[95]

## 1.   Prima face case

A plaintiff must satisfy three elements to establish a *prima facie* case of retaliation:  (1) he engaged in statutorily protected expression;[96] (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson*, 234 F.3d at

---

[95] *See* doc. no. 31 (Report and Recommendation) at 16-18.

[96] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment [or other unlawful employment practices]." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

507; *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Plaintiff easily satisfies the first two elements of his *prima facie* case. He engaged in statutorily protected expression when he complained to his superiors that he was being subjected to racial harassment. Plaintiff also suffered an adverse employment action when he was terminated. The only question is whether plaintiff can establish that there was "a causal linkage between the protected conduct and the adverse employment action."

"At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). In addition, a "close temporal proximity between two events may support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (emphasis supplied) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is* sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection") (emphasis supplied)); *see also, e.g.*, *Bass*, 256 F.3d at 1119 ("Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were

40

not wholly unrelated.") (emphasis supplied) (citing *Gupta*, 212 F.3d at 590 ("For purposes of a prima facie case, 'close temporal proximity' *may be* sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'") (emphasis supplied) (in turn quoting *Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three-month and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[97] In *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986), the

---

[97] In full text, the Supreme Court's statement in *Breeden* is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).

Eleventh Circuit held that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, including the fact that she was discharged *less than one month* after filing her complaint. *Id.* at 601.

Here, defendant terminated plaintiff on August 19, 1998. He complained to plant manager Williams sometime between August 1 and August 18 (or within 18 days of his termination) that Kinney, Jackson, and Woods were using racial slurs. The court finds that this evidence is sufficient to establish the third and final element of plaintiff's *prima facie* case. Williams, the ultimate decisionmaker, was aware of plaintiff's statutorily protected expression, and the timing of the expression and plaintiff's termination was sufficiently close to permit an inference of causation.

### 2.   Defendant's legitimate, nondiscriminatory reason for termination

Defendant states that it "terminated Plaintiff's employment in August 1998, because Plaintiff had threatened a fellow employee, Jeff Jackson."[98]

### 3.   Pretext

Plaintiff satisfied his burden to establish pretext with the following evidence: (1) there was close temporal proximity between plaintiff's reports of racial harassment to Williams and plaintiff's termination (*i.e.*, the same facts supporting plaintiff's *prima facie* case of retaliation); (2) defendant terminated plaintiff for threatening

---

[98] Doc. no. 15A (Memorandum of Law) at 13-14.

Jackson with physical violence, but did not terminate Troy the security guard, even though he threatened plaintiff in a similar manner; (3) Williams, the plant manager, told his secretary to "get rid of that crazy n[----]r" when plaintiff attempted to visit him at his office; (4) Girard, the plant's night shift Superintendent, passively observed employees yell "white power, white power, white power," and "n[----]r" in the plant; and (5) Kinney, plaintiff's direct supervisor, uttered racial slurs such as "n[----]r." Of course, with the exception of the first factor cited above, this is the same evidence which satisfied plaintiff's burden of establishing pretext with regard to his claim of discriminatory discharge:  *see supra* Part III(B)(3) of this memorandum opinion. Similarly, plaintiff's *prima facie* case of retaliation, combined with the "fairly strong additional evidence" supporting a showing of pretext, satisfy plaintiff's burden to discredit defendant's proffered reason for terminating plaintiff (*Id.*).

Accordingly, defendant's motion for summary judgment on plaintiff's claim of unlawful retaliation also is due to be denied.

## D.    Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1).  While this statutory language does not mention, let

alone define, "racial harassment" or a "hostile work environment," the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson* that "unwelcome *sexual* advances that create an offensive or hostile working environment violate Title VII.   Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."  477 U.S. 57, 64 (1986) (emphasis supplied).  The same logic applies here.  Indeed, it should come as no great surprise that the earliest hostile work environment cases addressed *racial* harassment.  *See, e.g., Firefighters Institute for Racial Equality v. St. Louis*, 549 F.2d 506, 514-15 (8th Cir. 1977) (employee eating clubs segregated by race created discriminatory work environment for African-American employees); *Gray v. Greyhound Lines*, 545 F.2d 169, 176 (D.C. Cir. 1976).[99]  As Justice Thomas observed in his dissenting opinion in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998),

---

[99] *See generally* Barbara Lindemann & David D. Kadue, Sexual Harassment in Employment Law 44 (1992), where the authors observe:

> The law of sexual harassment has drawn much of its content from the law of harassment based on race, national origin, and religion.  This borrowing, which has been quite self-conscious, has been based on the notion that each of the various forms of illegal discrimination can "poison" a working environment.  . . .

> In *Meritor Savings Bank v. Vinson*, [then] Justice William H. Rehnquist also recognized the relevance of nonsexual harassment cases, explaining that "a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality."

> The EEOC has also consistently encouraged courts to borrow from the jurisprudence of nonsexual harassment.  . . .  [Footnotes omitted.]

[y]ears before sexual harassment was recognized as "discriminat[ion] . . . because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), the Courts of Appeals considered whether, and when, a racially hostile work environment could violate Title VII.  In the landmark case *Rogers v. EEOC*, 454 F.2d 234 (1971), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972), the Court of Appeals for the [former] Fifth Circuit held that the practice of racially segregating patients in a doctor's office could amount to discrimination in "'the terms, conditions, or privileges'" of employment, thereby violating Title VII.  *Id*., at 238 (quoting 42 U.S.C. § 2000e-2(a)(1)).  . . .

Accordingly, after *Rogers*, a plaintiff claiming employment discrimination based upon race could assert a claim for a racially hostile work environment, in addition to the classic claim of so-called "disparate treatment."

*Id.* at 767-68 (Thomas, J., dissenting) (footnote omitted);[100] *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998).[101]

The Supreme Court also has stated that § 1981, as amended by the Civil Rights

---

[100] The omitted footnote provides that "[t]his sequence of events" — *i.e.*, the fact that federal courts addressed whether, and when, a racially hostile work environment violated Title VII "years before" sexual harassment was recognized as discrimination "because of sex" — "is not surprising, given that the primary goal of the Civil Rights Act of 1964 was to eradicate race discrimination and that the statute's ban on sex discrimination was added as an eleventh-hour amendment in an effort to kill the bill."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 767 n.1 (1998) (citing *Barnes v. Costle*, 561 F.2d 983, 987 (D.C. Cir. 1977)) (Thomas, J., dissenting).  *See also Miranda v. B & B Cash Grocery Store, Inc*. 975 F.2d 1518, 1526 (11th Cir. 1992) ("The legislative history of Title VII demonstrates that it was enacted primarily to counter racial discrimination; the prohibition against gender-based bias was added to the legislation at the last moment, and, according to some theories, in an effort to thwart passage of the Civil Rights Act.") (citing *County of Washington v. Gunther*, 452 U.S. 161, 190 n.4 (1981) (Rehnquist, J., dissenting)).

[101] Justice Souter, writing for the majority in *Faragher*, observed that, when holding that "environmental claims are covered" by Title VII in *Meritor*, *Harris*, and *Oncale*, the Supreme Court "drew upon earlier cases recognizing liability for discriminatory harassment based on race and national origin, . . . just as we have also followed the lead of such cases in attempting to define the severity of the offensive conditions necessary to constitute actionable sex discrimination under the statute."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998).

Act of 1991, encompasses claims for a racially hostile work environment. *See Jones v. R.R. Donnelley & Sons Company*, ___ U.S. ___ , 124 S. Ct. 1836, 1845-46 (2004).

The elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981. *See Vance,* 863 F.2d at 1509 n.3 ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.")); *see also*, *e.g.*, *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

"In order to prove a claim for a racially hostile work environment, a plaintiff must 'demonstrate that the actions of the defendants altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995)); *see also*, *e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (holding in the context of a suit brought by a Mexican-American plaintiff that a

46

national origin "hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

A *prima facie* racially hostile work environment case has five elements: (1) the employee belongs to a class of persons protected by Title VII and § 1981; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability.  *See, e.g., Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).  *Cf. Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (harassment based on the plaintiff's national origin); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment).[102]

---

[102] It should be noted that in the Eleventh Circuit, a hostile work environment claim is *not* subject to the *McDonnell Douglas* burden-shifting analysis.  In other words, a plaintiff may survive a defendant's motion for summary judgment on his hostile work environment claim by satisfying the five elements of his *prima facie* case.

In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit explained that "[g]enerally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile

Here, defendant does not dispute that plaintiff satisfies the first three elements of his *prima facie* case.   *Defendant also did not dispute that plaintiff satisfied the fourth element of his* prima facie *case*:  *i.e.*, that the harassment alleged by plaintiff was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment.[103]  Nevertheless, the

---

work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as '*quid pro quo*' harassment).  *Id.* at 508 (citation omitted).  All harassment by co-workers, as assumed in the present case, necessarily falls into the first category of hostile work environment because co-workers cannot take employment actions against each other. *See id.*

The "normal principles of pleading and proof allocation" apply to claims of hostile work environment.  *Id.* at 511 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 905 n.11 (11th Cir. 1982)).  The *Johnson* Court held that likewise, the "normal principles of pleading and proof allocation" — and not the burden shifting framework of *McDonnell Douglas* — apply to claims of harassment that does result in a tangible employment action.  *Id.* at 510-511.

Other circuits have taken different approaches.  The Sixth Circuit applies the *McDonnell Douglas* framework to claims of "disparate treatment sexual harassment," but not to claims of hostile work environment.  *See Pollard v. E.I. Dupont de Nemours Company*, 213 F.3d 933, 943 (6th Cir. 2000) ("When a plaintiff proves that a hostile work environment existed, there is no legitimate justification for such an environment, and thus recourse to the *McDonnell Douglas* test is not warranted."), *rev'd on other grounds*, 532 U.S. 843 (2001).  The Eight Circuit applies the *McDonnell Douglas* analysis to claims of hostile work environment, which neither the Eleventh or Sixth Circuit do.  *See Erenberg v. Methodist Hospital*, 357 F.3d 787, 792 (8th Cir. 2004) (stating that plaintiff's "hostile work environment claims are evaluated under the burden shifting analysis of *McDonnell Douglas*").

This court could not locate a Supreme Court decision resolving these differences.

[103] Defendant stated in its brief in support of its motion for summary judgment:

Plaintiff . . . alleges that he was subjected to racial harassment by co-employees. Thus, to the extent that Plaintiff can produce evidence that this alleged behavior is severe and pervasive enough to alter the terms and conditions of his employment, the Defendant is then permitted to exonerate itself by showing that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant [*i.e.*, relying on the *fifth* element of plaintiff's *prima facie* case].  Plaintiff's evidence of racial harassment consists of a number of remarks and non-verbal racially offensive behaviors made by his co-workers.  *Assuming for the purposes of summary judgment that Plaintiff was subjected to a racially hostile environment*, his claim still fails in that he cannot show that he took advantage of the

Magistrate Judge concluded that plaintiff failed to satisfy the fourth element of his *prima facie* case, and recommended that the court grant defendant's motion for summary judgment on those grounds. The court therefore turns first and foremost to this recommendation by the Magistrate Judge.

### 1.     Severe or pervasive harassment

The fourth element contains both an objective and subjective component. To be actionable, a plaintiff must show not just that he subjectively believed the environment to be hostile or abusive, but that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Sytems, Inc.*, 510 U.S. 17, 21-22 (1993).

Plaintiff unquestionably perceived the racial slurs of his supervisors and co-workers to be hostile and abusive. Plaintiff lodged multiple complaints with Williams, Girard, and McHan in protest. Furthermore, plaintiff reported the slurs to Williams, even though Williams himself had uttered the term "n[----]r," so that

---

procedures Defendant had in place to address racial harassment.

Doc. no. 15A (Memorandum of Law) at 36-37 (emphasis supplied).

Defendant also glossed over the fourth element of plaintiff's *prima facie* case in subsequent submissions to this court. *See, e.g.,* doc. no. 37 (Defendant's response to plaintiff's objection to Report and Recommendation) at 6 ("[T]o the extent Plaintiff's evidence is sufficient to show that his co-workers subjected him to severe and pervasive racial harassment, which it does not, the undisputed evidence demonstrates that Defendant was not legally responsible for these alleged comments.").

plaintiff "didn't feel comfortable talking to him no more."[104]  Plaintiff also overheard Kinney make a remark about the "big oak tree."  Plaintiff testified:  "and I was sitting there [listening to Kinney,] and how do you think I feel?"[105]

When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include such factors as:  the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance. *Harris*, 510 U.S. at 23; *see also, e.g., Miller*, 277 F.2d at 1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997); *Edwards*, 49 F.3d at 1521.

Without question, plaintiff was subjected to severe and humiliating harassment. In *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir. 1990), the Eleventh Circuit characterized the term "n[----]r" as "flagrant, revolting, and inflammatory," and remarked that the use of the term by an employee's supervisor reflected a "deplorable atmosphere of open, hostile, and racially motivated discrimination." *Id.* at 1068-1069 & n.3.  The Fourth Circuit added, that "far more than a 'mere offensive utterance,' the word 'n[----]r' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive

---

[104] Parker Deposition, Vol. I at 204.

[105] *Id.* at 243-244.

working environment than the use of an unambiguously racial epithet such as 'n[----]r'

by a supervisor in the presence of his subordinates.'" *Spriggs v. Diamond Auto Glass*,

242 F.3d 179, 185 (4th Cir. 2001).  The Fifth Circuit concurred that "the term 'n[----

]r' is a universally recognized opprobrium, stigmatizing African-Americans because

of their race." *Brown v. East Mississippi Electrical Power Association*, 989 F.2d 858,

861 (5th Cir. 1993).  A remark that an African American individual should be taken

out to the "big oak tree" is no less deplorable:  indeed, because the remark clearly

references lynching — the ultimate expression of the inhumanity to which persons of

African ancestry were subjected by a racist society — the remark arguably is more

demeaning and despicable than the "N word."

     The fact that plaintiff's co-workers and superiors did not always direct their

racial epithets at plaintiff is not determinative.  *See Walker v. Ford Motor Company,*

684 F.2d 1355, 1359 n.2 (11th Cir. 1982).  In *Walker*, the plaintiff claimed that his

supervisors and co-workers used the terms "black ass" and "n[----]r-rigged" in his

presence, although not in direct reference to him.  This nevertheless created "a

working environment heavily charged with . . . racial discrimination," because "the

offensive language often was used in [plaintiff's] presence *after he had voiced*

*objections*" to his employer.  *Id.*  Here, plaintiff was in like manner subjected to racial

harassment even after he voiced his objections to Girard, Williams, and McHan.

Another factor that the court must consider is how frequently plaintiff's co-workers and superiors engaged in the objectionable conduct.  In *Mendoza v. Borden*, 195 F.3d 1238 (11th Cir. 1999), the court held that five sexually-oriented incidents over an eleventh month period "were far too infrequent to alter the conditions under which [plaintiff] was required to perform her job." *Id.* at 1249.  In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit concluded that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent, and distinguished that case from *Mendoza*, "where there were fewer instances of less objectionable conduct over longer periods of time." *Id.* at 509.

Here, plaintiff identifies seven separate incidents of racial harassment in the eleven months immediately preceding his termination.  This falls between the benchmarks set in *Mendoza* and *Johnson*, although closer to the former than the latter case.  The frequency increases, however, if the court considers that the seven acts of racial harassment encompassed racial comments made by twelve individuals.  Arguably, the court may consider each co-worker's conduct as a separate incident of racial harassment.  Either way, Eleventh Circuit precedent does not preclude a finding of a hostile work environment based on the frequency of the objectionable conduct.  Finally, the record does not suggest that the racial slurs uttered by plaintiff's co-

workers and superiors significantly interfered with plaintiff's ability to do his job.

Based on these factors, a reasonable jury could conclude that plaintiff was subjected to an objectively hostile work environment.  Plaintiff was subjected to the most intolerable racial slur, on a not infrequent basis, by both co-workers *and supervisors*, and his pleas to stamp out such racial hostility largely went unanswered.

Accordingly, the court finds that plaintiff has satisfied the fourth element of his *prima facie* case.

### 2.    Employer liability

The fifth and final element of the *prima facie* case was clarified by the Supreme Court in two decisions delivered on the same day, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). "Although *Faragher* and *Ellerth* involved sexual harassment, the principles established in those cases apply with equal force to [a] case of racial harassment . . . ." *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998); *see also Faragher*, 524 U.S. at 787 n.1 ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.").

The principles of liability established by *Faragher* and *Ellerth* were

summarized by the Eleventh Circuit in *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002).  Generally speaking, an employer is held to different standards of liability depending on whether the hostile work environment was created by the conduct of an employee's superiors, or by co-workers.[106]

Here, the parties dispute whether the conduct of Williams and Kinney, plaintiff's supervisors, created the hostile work environment, or whether the conduct of plaintiff's co-workers did so.  The court will assume, for the sake of discussion, that defendant identifies the correct legal analysis:  *i.e.*, that the hostile work environment

---

[106] The *Miller* Court stated:

>    An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998).  The employer will be strictly liable for the hostile environment if the supervisor takes [a] tangible employment action against the victim.  *See id.* at 807, 118 S. Ct. at 2293.  However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages:  "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S. Ct. at 2292-93.  Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.  *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000).  Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer.  *See id.*
>    Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it.  . . .

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002).

was *created* by the conduct of plaintiff's co-workers, but his supervisors clearly *condoned* it.

In cases where the harassers are a plaintiff's co-workers, the employer's liability is judged by a negligence standard — that is, a plaintiff must prove that the employer either knew, or should have known of the alleged harassment, but failed to take prompt and appropriate remedial action.  *See, e.g., Faragher*, 524 U.S. at 799 (collecting cases); *Ellerth*  524 U.S. at 759 ("Negligence sets a minimum standard for employer liability under Title VII.").  The negligence standard thus requires a two-step analysis — issue of notice, and issue of remedial action.

With regard to the first step of the analysis, the Eleventh Circuit has explained that, when an employer promulgates and effectively disseminates a clear policy for reporting sexual harassment, the manner and means by which an employer may be deemed to have acquired knowledge of the offensive conduct is established by the terms of the policy. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2002) (holding in the context of co-worker harassment that, "if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment").  Here, defendant does not dispute that plaintiff lodged multiple

complaints of racial harassment with Williams, Girard, and McHan, in compliance

with defendant's published policy prohibiting racial harassment in the workplace.

Rather, defendant pins its defense on the second step of the negligence analysis:

*i.e.*, whether it took prompt and appropriate remedial action to address plaintiff's

reports of racial harassment. According to defendant,

> Plaintiff's argument that Defendant did not address his complaints, and
> thus failed to remedy the alleged discrimination is fatally flawed: he did
> not produce admissible evidence regarding whether management did or
> did not address his complaints *and* he does not allege that any employee
> about whom he complained continued to harass him in any manner
> following the complaint. The undisputed facts are not sufficient to
> trigger employer liability.

Doc. no. 37 (Defendant's Response) at 6-7 (emphasis in original). Defendant's

argument is unpersuasive.

First, plaintiff did state that, "despite my complaints [of racial harassment],

management never took any action to remedy the situation."[107] Plaintiff also testified

that, following his reports of racial harassment, McHan did nothing more than say "oh

how awful." Further, Girard stood idly by as employees chanted "white power" and

"n[----]r" in the plant, even though plaintiff had complained to Girard about that

conduct *and* the confederate flag T-shift worn by co-worker Jackie Woods. Three

months later, plaintiff overheard Woods utter racial slurs, including the term "n[----

---

[107] Doc. no. 22 (Plaintiff's Evidentiary Submission) Tab 1, ¶ 1 at 1.

Jr."[108]  In sum, defendant's contention that no co-worker harassed plaintiff after he complained of the co-worker's racist behavior is factually inaccurate.

Furthermore, the court disagrees with defendant's argument that it may be exonerated from liability, as long as plaintiff was not harassed by the *same* co-worker or supervisor following a complaint of racial harassment.  Carried to an extreme, this argument suggests that each of the 220 employees at the Holly Pond facility could subject plaintiff to racial harassment serially, one after the other, with no consequences to defendant.  An employer is obliged, when responding to an employee's report of racial harassment, to investigate an employee's charges and to present a reasonable basis for any remedial actions subsequently undertaken.  *Cf. Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir. 1987) ("In taking remedial action, USAIR was obliged to investigate Swentek's charges [of sexual harassment] and to present a reasonable basis for its subsequent actions.").  Stated differently,

> [t]he most significant immediate measure an employer can take in response to a sexual [or racial] harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. *An investigation is a key step in the employer's response, see Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir. 1987) (employer obliged to investigate complaint and to present a reasonable basis for its subsequent action), *and can itself be a powerful factor in deterring future harassment.*  By opening a sexual harassment investigation, the employer puts *all employees on notice* that it takes such allegations seriously and will not tolerate harassment in the workplace.  *An*

---

[108] *See, e.g.,* doc. no. 22 (Plaintiff's Evidentiary Submission), Tab 2 at 2.

*investigation is a warning, not by words but by action.*

*Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001) (internal citation omitted) (emphasis supplied). Defendant's policy was to conduct a "full investigation" of each report of racial harassment. Such investigations, if they were indeed undertaken, were apparently insufficient to put defendant's employees on notice that racial harassment would not be tolerated in the Holly Pond plant.

Accordingly, plaintiff satisfies the fifth and final element of his *prima facie* case, and defendant's motion for summary judgment on plaintiff's claim of hostile work environment is due to be denied.

## IV. CONCLUSION

In accordance with the foregoing, this court accepts that part of the Magistrate Judge's report recommending that defendant's motion for summary judgment on plaintiff's claims of discriminatory discharge and unlawful retaliation related to plaintiff's *second* period of employment is due to be granted. However, this court rejects that part of the same report recommending that defendant's motion for summary judgment be granted with respect to plaintiff's claims of discriminatory discharge, unlawful retaliation, and hostile work environment related to plaintiff's *first* period of employment. That aspect of defendant's motion is due to be, and will be, denied. An appropriate order will be entered contemporaneously herewith.

DONE this 26th day of January, 2005.

_____
United States District Judge